United States District Court
District of Connecticut
FILED AT NEW HAVEN

February 7  20 23

By      S. Santos
              Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | ss: New Haven, Connecticut |
| | : | |
| | : | February 7, 2023   3:23-mj-93 (MEG) |
| COUNTY OF NEW HAVEN | : | |
| | : | **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF ARREST WARRANT AND SEARCH WARRANTS

I, Maria Case, being first duly sworn, hereby depose and state as follows:

### BACKGROUND OF AFFIANT

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses.

2.      I am employed as a police officer with the Meriden Police Department, located in Meriden, Connecticut.  I have been employed by the Meriden Police Department since December of 2017.  From May of 2021 to November of 2021, I was assigned to the Meriden Police Department's Crime Suppression Unit. This unit's primary focus is street crime and narcotics investigations.  I have made arrests for a variety of narcotics violations.

3.      I am currently assigned to the Drug Enforcement Administration ("DEA"), New Haven District Office ("NHDO"), as a Task Force Officer ("TFO").  I have been assigned to the DEA as a TFO since November of 2021.  In my capacity as a TFO, I am a participating member of the Organized Crime Drug Enforcement Task Force, which is comprised of personnel from federal, state, and local law enforcement agencies.

4.      During my time as a TFO, I have participated in numerous criminal investigations involving suspected narcotics trafficking by individuals and organizations. I have become familiar

with narcotics activities including the manner in which controlled substances are commonly imported, manufactured, processed, packaged, and distributed.  In connection with these investigations, I have written and been an affiant on several search and seizure warrant affidavits and have participated in the execution of numerous search and arrest warrants.  I have also been involved in controlled purchases of illegal drugs utilizing cooperating sources; conducted electronic and physical surveillance of individuals involved in illegal drug distribution; and debriefed cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement.  The numerous investigations in which I have participated have resulted in state and federal convictions of numerous individuals for narcotics trafficking offenses and/or other criminal offenses.

### Purpose of the Affidavit

5.       I submit this affidavit in support of a criminal complaint and an application for an arrest warrant charging ACEVEDO with violations of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute Controlled Substances).

6.       This affidavit is also submitted in support of search warrants under Rule 41 of the Federal Rules of Criminal Procedure to search the following premises, as further described in Attachments A-1 & A-2, because there is probable cause to believe and I do believe that they contain evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute Controlled Substances) and 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), as further described in Attachments B-1 &

B-2:

>  (a) 54 South Avenue, Meriden, CT, as further described in Attachment A-1 ("TARGET PREMISES 1"); and
>
>  (b) 231 West Main Street, Meriden, CT as further described in Attachment A-2 ("TARGET PREMISES 2").

7.      The facts in this affidavit come from a variety of different investigative techniques, including but not limited to, my personal observations and review of records, physical surveillance, the use of pole cameras, trash pulls, the obtaining of precise location information, the gathering of intelligence from reliable cooperating sources, controlled purchases of drugs, and information, which I have determined to be accurate and reliable, provided to me by other law enforcement officers, including my co-case agents in this investigation.

8.      This affidavit sets forth facts and evidence that are relevant to the requested arrest warrant and search warrants but does not set forth all of the facts and evidence that I have gathered during the course of the investigation of this matter.  Rather, I have only set forth the facts that are necessary to establish probable cause to support the issuance of the arrest warrant and the search warrants.

## **INVESTIGATION BACKGROUND AND PROBABLE CAUSE**

### **Background Regarding the Investigation and Relevant Historical Information**

9.      On June 7, 2021, the Meriden Police Department arrested Miguel ACEVEDO at his residence, 54 South Ave, Meriden, Connecticut ("TARGET PREMISES 1") for Criminal Possession of a Firearm, Possession of Narcotics with Intent to Sell, Possession of Narcotics, and other motor vehicle violations.  Meriden police also executed a state search warrant at TARGET

PREMISES 1 on that same date, seizing approximately $281,537 in U.S. currency and approximately 390.9 grams of suspected crack/cocaine. The state case is still pending and ACEVEDO was released on bond the same day. After the seizure of US Currency as suspected drug proceeds by the Meriden Police Department, the DEA NHDO federally adopted the forfeiture.

10.     Shortly after ACEVEDO's arrest, in and around the June/July 2021 timeframe, ACEVEDO was identified as a suspected source of supply of cocaine for a target of a separate DEA NHDO investigation. As a result, investigators began looking into ACEVEDO's activities.

**Introduction of Cooperating Source to ACEVEDO**

11.     Investigators learned that approximately two weeks after his arrest, on June 25, 2021, ACEVEDO registered a new business with the State of Connecticut, Secretary of State called ACEVEDO Detailing and Car Sales LLC ("Acevedo Detailing") with an address of 231 West Main Street, in Meriden, CT ("TARGET PREMISES 2"). The business appears to be located in a single-story commercial building with a long driveway that is fenced in on the right side and leads to a single garage bay with a built-in entryway door. The inside of the business is wide open similar to a warehouse from the front entrance to the rear of the building, with at least two interior rooms. ACEVEDO is listed as the Managing Member and sole principal of the business. Due to its proximity to his arrest and the search of his residence, investigators became concerned that ACEVEDO could be attempting to move his narcotics trafficking operation to a business location.

12.     For that reason, investigators used a DEA Cooperating Source ("CS"), who was not familiar with or known to ACEVEDO,  to conduct a cold, unannounced, meet with ACEVEDO at

TARGET PREMISES 2.[1]

13.     On October 20, 2022, the CS arrived at TARGET PREMISES 2 at approximately 12:50 p.m.  Prior to arriving, the CS had been debriefed by members of the NHDO and provided both an audio and video recording device.  Members of the NHDO also conducted physical surveillance at TARGET PREMISES 2 during the duration of the meeting.  After entering TARGET PREMISES 2, the CS and ACEVEDO engaged in a casual conversation, in a mixture of Spanish and English.  In sum and substance, ACEVEDO stated that he buys, flips, washes, and sells cars.  ACEVEDO also stated that he does full vehicle detailing both inside and outside and that he works under the radar.  ACEVEDO further stated that he is also involved in "pasto" and that "they" recently started working in that because ACEVEDO was mainly and normally involved with "perico."  ACEVEDO added that the "pasto" is something new that is being tried now.

14.     I know, after discussions with other members of the NHDO, that "pasto" is translatable from Spanish to English as grass, which is a common term for marijuana, and that "perico" is a common Spanish language slang term for cocaine.  Based on these statements, investigators believe ACEVEDO is working with others to distribute illegal narcotics.

15.     During the conversation, ACEVEDO also stated he knows a "trap-maker" that is located in Waterbury and is a Dominican Republic national that works very discreetly. Investigators know that that a trap-maker is someone who builds custom hidden compartments in vehicles to hide narcotics, money, and/or firearms from law enforcement should they be stopped

---

[1] The CS has provided reliable information in the past and is believed to be truthful, accurate, and reliable.  Unless otherwise stated, any information obtained from the CS in this case has been related to your affiant by the source or by other members of the NHDO who have debriefed the source.  Moreover, unless otherwise stated, all source information set forth herein is based upon personal observations by the source and/or statements directed to or overheard by the source, from ACEVEDO.

while in transit.

16.     During the conversation, ACEVEDO also provided his cellular phone number to the CS as (203) 886–9372 and his first name as Miguel.  This is the same phone number that ACEVEDO has listed on the sign for Acevedo Detailing outside of the business and the same number that ACEVEDO was using at the time of his arrest in June of 2021.[2]  The conversation ended shortly afterwards, and the CS departed TARGET PREMISES 2.  The entire meeting between the CS and ACEVEDO was completed with audio and video recording.

**Controlled Purchase #1 from ACEVEDO with Cooperating Source**

17.     On December 15, 2022, members of the DEA NHDO conducted a controlled purchase of approximately one ounce of cocaine from ACEVEDO utilizing the same CS discussed previously.  Prior to the transaction, surveillance was established in the area of TARGET PREMISES 2.  The CS did not call or notify ACEVEDO that he/she would be coming to see him.  At approximately 2:10 p.m., the CS arrived at TARGET PREMISES 2 and knocked on the closed garage bay door.  After no one answered, the CS called ACEVEDO on his cellular phone utilizing the phone number previously provided.  ACEVEDO told the CS that he was out picking up a vehicle and would be back in approximately 30 minutes.  At approximately 2:44 p.m., a heavily tinted blue Toyota Sienna mini-van was observed via pole camera, in real-time, entering the

---

[2] Approximately two days after his arrest, Acevedo transferred his phone number from the phone he had been using at the time of his arrest, to a new phone.  A search of the phone seized by Meriden Police at the time of his arrest that was originally assigned the (203) 886–9372  phone number, revealed hundreds of photos depicting a variety of: (1) kilogram quantities of narcotics, believed to be cocaine, in various stages of wrapping; (2) cash in various stages – loose, banded, wrapped, and vacuum sealed for shipping; (3) USPS boxes addressed to Puerto Rico, believed to contain narcotics proceeds disguised in packages of bed sheets; and (4) numerous USPS receipts showing packages paid for and sent to Puerto Rico, believed to contain narcotics proceeds.  A video that investigators believe Acevedo took showing at least 14 bundles of cash that was banded together and tightly saran wrapped with notes indicating the amounts written on them for an estimated total of $371,750.  The phone also contained what investigators suspect is discussions of narcotics trafficking with numerous individuals.

driveway of TARGET PREMISES 2.  The garage door to the business opened, the mini-van entered, and then the garage door shut.  Prior to this observation, your affiant had received information in or about November of 2022 from Detective Dorais of the Meriden Police Department who advised that a Source of Information ("SOI") provided information that ACEVEDO had been openly selling narcotics on the property located on Old Colony Road in Meriden, Connecticut and had been operating a heavily tinted Toyota Sienna Mini Van.

18.     At approximately 3:32 p.m., the CS re-approached TARGET PREMISES 2 and knocked on the garage bay door after not being able to make contact with ACEVEDO via cellular phone.  ACEVEDO answered the door and engaged in conversation with the CS.  The CS informed ACEVEDO that he/she was looking to purchase an ounce of cocaine based on their previous conversation.  ACEVEDO stated that it would cost $850.  The CS stated that he/she had $800, to which ACEVEDO agreed but stated that he had to go get it.  The CS was instructed to move his/her vehicle into an adjoining parking lot and wait for ACEVEDO.

19.     At approximately 3:40 p.m., investigators observed the heavily tinted blue Toyota Sienna mini-van exit the business and turn onto West Main Street.  Investigators could not see the driver, but believe ACEVEDO was operating the vehicle.  Surveillance was maintained on the blue mini-van until it pulled into a gas station located at 80 Cooke Avenue in Meriden, CT. Surveillance was stopped because it became clear to investigators, through their training and experience, that the operator of the blue mini-van, believed to be ACEVEDO, was performing irregular driving maneuvers that are normally utilized to deter surveillance.  At that point, an investigator was instructed to proceed to Old Colony Road in Meriden, CT and conduct surveillance based on the information recently provided by Meriden Police Department's SOI.

20.     At approximately 4:16 p.m., an investigator observed a black Jeep Grand Cherokee with dark tints and chrome trim leave the driveway of the address on Old Colony Rd, which investigators had learned may be an address related to ACEVEDO.  At approximately 4:21 p.m., a black Jeep Grand Cherokee with dark tints and chrome trim was observed via pole camera entering the driveway of TARGET PREMISES 2, the garage door opens, and the vehicle enters. The timing of the Jeep's departure of Old Colony Rd and arrival at TARGET PREMISES 2 is consistent with it being the same vehicle—for example, according to Google Maps, travel time between the two locations is approximately six minutes.  In addition, the CS confirmed to investigators that ACEVEDO was operating the black Jeep.  At approximately 4:22 p.m., ACEVEDO was observed opening the garage bay door and letting the CS inside, closing the door behind them.

21.     The controlled purchase was audio and video recorded.  In sum and substance, the CS can be heard saying here is "$800."  The CS and ACEVEDO engage in further conversation in which ACEVEDO appeared to wonder aloud whether he could trust the CS as ACEVEDO did not know him/her, but then further stated that he could sell the CS a kilogram of cocaine for $21,500 and that he could get up to 10 or 15 kilograms of cocaine at a time.  ACEVEDO also stated that he could transport the narcotics to other places like Waterbury if needed.  ACEVEDO further stated that he does not like to talk over the phone and only wants to talk via FaceTime. ACEVEDO informed the CS that the cocaine was "fire" and that ACEVEDO does not deal with bad product.  The CS then departs the business with the cocaine purchased from ACEVEDO.  A representative sample of the cocaine the CS purchased from ACEVEDO was field tested and yielded a positive result for the presumptive presence of crack/cocaine.  The cocaine weighed

approximately 59.98 gross grams.  The cocaine was then sent to a DEA laboratory for further testing and analysis.

22.     The video recording device used by the CS during the meeting with ACEVEDO captured the inside of TARGET PREMISES 2.  A visible surveillance camera monitor was next to the door on the left upon entering that appeared to have several camera views mounted.  There also appeared to be approximately 16 vehicles parked in the garage in various locations, including the black Jeep Grand Cherokee that ACEVEDO arrived in.  The black Jeep had a State of Arkansas Dealer registration marker on it that is registered to an automotive business in Eureka Springs, Arkansas.  Based on training and experience, I know that narcotics traffickers will also use license plates registered to businesses and other individuals in order to remain anonymous from law enforcement.

23.     The video recording device also showed an office inside the garage bay door to immediately to the left.  Inside the office, the recording device briefly captures what appears to be a desk and a computer monitor.

**Controlled Purchase #2 from Acevedo with Cooperating Source**

24.     On December 19, 2022, the CS called ACEVEDO, via FaceTime, at 203-886-9372. The conversation was recorded and occurred in both English and Spanish.  During the call, the CS told ACEVEDO that the cocaine he purchased from ACEVEDO was "fire."  The CS also told ACEVEDO that he was going to be back in a couple weeks and asked ACEVEDO how much it would cost for a quarter or half, referring to a quarter or a half a kilogram quantity of cocaine. ACEVEDO told the CS that he could give the CS a "half" at "eleven five hundred" and that comes

out to "twenty-three" a gram.[3]   Investigators believe ACEVEDO was talking about a half a

kilogram of cocaine for $11,500, which would come out to $23 dollars per gram.   The CS told

ACEVEDO that he would let ACEVEDO know ahead of time when the CS would be coming to

see ACEVEDO.   ACEVEDO responded, "Hell yeah, I'm not going to steer you wrong man" and

the FaceTime call ended shortly after.   Investigators know that narcotics traffickers often use

FaceTime to communicate in order to prevent interception by law enforcement.

25.     On January 24, 2023, members of the DEA NHDO conducted a second controlled

purchase of approximately three ounces of cocaine from ACEVEDO utilizing the same DEA CS.

The purchase began at approximately 2:13 p.m. when the CS made a controlled and supervised

FaceTime call to ACEVEDO's cellular phone number 203-886-9372, in sum and in substance, the

CS stated he/she was at the mall and wanted to stop by and to talk to ACEVEDO about something.

The CS did not indicate that the meeting was to purchase drugs. ACEVEDO agreed to meet with

the CS.  At approximately 2:20 p.m., ACEVEDO was observed via pole camera exiting TARGET

PREMISES 2 and entering the tire shop located next door at 223 West Main Street.   At

approximately 2:23 p.m., the CS was observed arriving and parking in the adjoining tire shop

parking lot.  As the CS exited his/her vehicle, ACEVEDO was observed exiting the tire shop and

greeting the CS.   Both ACEVEDO and the CS were then observed walking into TARGET

PREMISES 2 together.

26.     At approximately 2:25 p.m., the CS was observed exiting TARGET PREMISES 2

and entering his/her vehicle.  The CS advised investigators that ACEVEDO wanted him/her to

return to TARGET PREMISES 2 in 20 minutes.  At approximately 2:26 p.m., the CS departed the

---

[3] To the extent recorded conversations between the CS and ACEVEDO were in Spanish, the translations herein were
provided by a native-speaking DEA investigator.

parking lot and was followed back to a predetermined location under constant surveillance. At the predetermined location, the CS stated to investigators in sum and in substance that there appeared to be fewer vehicles in the business than during the previous encounters at the location, however there was a black BMW in the shop parked near the garage door. The CS stated he/she informed ACEVEDO that he/she did not have enough money to purchase the half a kilogram quantity of cocaine they had previously discussed but that he/she had enough to purchase three ounces today, to which ACEVEDO responded that was fine.  ACEVEDO asked the CS to return to TARGET PREMISES 2 in 20 minutes, further claiming that he wanted to complete the sale of the black BMW parked in the garage and that he had to stop to pick the product up.  ACEVEDO told the CS that ACEVEDO repossessed a vehicle from someone who had owed him money and he was trying to sell it.[4]

27.     At approximately 2:53 p.m., ACEVEDO contacted the CS via FaceTime and told him/her to return back to TARGET PREMISES 2.  At approximately 2:59 p.m., the CS arrived and parked in the tire shop parking lot located next door to TARGET PREMISES 2.  The CS was observed via pole camera as he/she exited his/her vehicle and walked to the entryway door of the garage and entered into TARGET PREMISES 2.  ACEVEDO and the CS engaged in conversation inside.  At approximately 3:01 p.m., the CS was observed as he/she exited TARGET PREMISES 2 through the entryway door of the garage and re-entered his/her vehicle.  At that point, the CS informed investigators that the deal had occurred.  The CS then departed TARGET PREMISES 2

---

[4] At approximately 2:27 p.m., a white BMW sedan was observed arriving at TARGET PREMISES 2 and two unidentified males exited the vehicle and entered the business.  At approximately 2:40 p.m., the garage bay door opened and a black BMW exited from inside the business.  Investigators could not see who was operating the vehicle.  Surveillance was maintained on the vehicle as it did a loop around an adjoining block and returned to the business at 2:45 p.m., consistent with a test drive of the BMW that ACEVEDO indicated he was trying to sell.  At no time did the black BMW make any stops.   Other than potentially riding in the black BMW for the test drive, Acevedo was not seen leaving TARGET PREMISES 2 at any point between when the CS departed and returned.

with the cocaine purchased from ACEVEDO.

28.     The controlled purchase was audio recorded.  In sum and substance, the CS advised that he did not observe anyone else in the business and that ACEVEDO handed him/her the narcotics from ACEVEDO's hoodie pocket.  The CS did not see where ACEVEDO acquired the drugs from in the business.  The CS advised ACEVEDO that he/she was trying to sell his/her truck for additional funds.  The CS further advised ACEVEDO that half of the 3 ounces were for his/her friend and that once he/she got the money together in the future, between $80,000 to $100,000, he/she and the friend were going to go half on the purchase of multiple kilogram quantities of cocaine.  ACEVEDO acknowledged the CS's idea of a larger buy and said "let me know, the same way… that you going to come by."  The CS understood this to mean that ACEVEDO had kilogram quantities of cocaine on hand and the CS should contact ACEVEDO in the same way he/she has on previous occasions to conduct a buy.

29.     A representative sample of the cocaine the CS purchased from ACEVEDO was field tested and yielded a positive result for the presumptive presence of crack/cocaine.  The cocaine weighed approximately 114.22 gross grams.  This weight is consistent with three ounces of cocaine.  The cocaine was then sent to a DEA laboratory for further testing and analysis.

30.     Based upon the foregoing, there is probable cause to believe and I do believe that on or about December 15, 2022, and January 24, 2023, in the District of Connecticut, ACEVEDO possessed with the intent to distribute and did distribute controlled substances, namely cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

**Acevedo Residence – 54 South Ave, Meriden, CT (TARGET PREMISES 1)**

31.     As set forth above, Meriden Police conducted a search warrant at TARGET

PREMISES 1 on June 7, 2021.    At the time of the search, an individual referred to herein as

"A.R." told Meriden Police that she had moved to TARGET PREMISES 1 about one year prior.

Inside a first-floor bedroom at TARGET PREMSIES 1, Meriden Police found the left side of the

bedroom contained property belonging to ACEVEDO and the right side contained property

belonging to A.R.  Also found in the bedroom was identification cards and mail belonging to

ACEVEDO.

32.      On August 9, 2022, a trash pull was conducted at TARGET PREMISES 1.  All

trash was removed from garbage cans located at the curb awaiting pick up.  Two pieces of mail

were recovered, among other items.  One piece of mail was addressed to A.R. at TARGET

PREMISES 1 and another piece of mail was addressed to ACEVEDO's adolescent son at the same

address.

33.      On September 20, 2022, another trash pull was conducted at TARGET PREMISES

1.  All trash was removed from garbage cans located at the curb awaiting pick up.  A U.S. Postal

Box was recovered addressed to A.R. at TARGET PREMISES 1.  The sender information on the

Postal Box was listed as "Anixa Vazquez" with an address of Calle 411 blg 140 #20, Villa Carolina

xta, Carolina P.R., 00985.  Through training and experience, investigators know that it is common

for narcotics traffickers to mail quantities of narcotics and money to and from Puerto Rico utilizing

the postal system or commercial shipping businesses such as UPS or Fed-Ex.  Investigators know

that narcotics traffickers will often use abbreviated names, fictional names, and/or the names of

un-related third parties to send and receive illegal narcotics and money so as to remain anonymous

from law enforcement.  The listed first name of the sender on the recovered Postal Box is an

abbreviated name for A.R.'s first name and the listed last name of the sender is part of A.R.'s

hyphenated last name.  Investigators suspect this package was a shipment of illegal narcotics as the sender of this package intentionally used a variation of A.R.'s name to remain anonymous and prevent detection by law enforcement should it be seized.

34.     In addition to the U.S. Postal Box, a trash bag was recovered containing the following: (1) "Taylor" digital scale box and instruction manual, (1) cardboard box labeled "Hefty Storage Slider" quart slider bags, and (1) cut open "Food Saver" vacuum seal plastic wrapping bag with "25,000," "25,00," and "25,00" written on it in black ink.  Based on training and experience, investigators know these items are used to properly weigh and package narcotics.  Investigators also know that the "Food Saver" vacuum sealed bags are often used to package kilogram quantities of narcotics and packages of money.

35.     Moreover, when Meriden Police seized $281,537 in cash from TARGET PREMISES 1 in June of 2021, at least 9 stacks of cash were found banded together.  Some stacks of cash were wrapped in saran wrap and others were tightly vacuum sealed in plastic packaging, similar to the vacuum seal packaging found in the trash pull.

36.     On October 11, 2022, a third trash pull was conducted at TARGET PREMISES 1. All trash was removed from garbage cans located at the curb awaiting pick up.  Recovered from one garbage bag was a cut open heat-sealed clear plastic bag that had "1.5 lbs" written on the side in black ink.  The plastic bag appeared to have an unknown white colored waxy substance on the inside.  The following were also recovered during the trash pull: (4) Ziploc bags inside a larger Ziploc bag, and (1) piece of mail addressed to A.R. at TARGET PREMISES 1.

37.     A pole camera was installed in the vicinity of TARGET PREMISES 1 on or about November 30, 2022.  The camera is positioned on a public street and captures a view of the front

of ACEVEDO's residence.  ACEVEDO has been seen almost daily coming to and from TARGET PREMISES 1 on the pole camera.

38.     On January 24, 2023, the day of controlled purchase #2, at approximately 1:54 p.m., ACEVEDO was observed via pole camera, exiting TARGET PREMISES 1 carrying a black backpack with a white stripe down the center of the front.  ACEVEDO got into a black Jeep Grand Cherokee with dark tints and chrome trim and drove away from the residence.  ACEVEDO was seen operating the same black Jeep on December 15, 2022, during controlled purchase #1, described above.

39.     The backpack ACEVEDO was observed carrying out to the black Jeep appeared to be sagging as though it was weighted down.  The main compartment of the backpack was unzipped and the front of the bag was leaning forward partially exposing the main compartment of the backpack.  Given the way the front of the bag was leaning forward and the bottom of the bag was sagging, it appeared as though the bag was weighted down.  I suspect this bag may have contained illegal narcotics, part of which, ACEVEDO sold a short while later during controlled purchase #2, which was previously described.

40.     At approximately 1:56 p.m., ACEVEDO was observed via pole camera arriving at TARGET PREMISES 2 in the black Jeep Grand Cherokee.  Approximately one minute had passed from when ACEVEDO departed his residence and arrived at TARGET PREMISES 2.  According to Google Maps, travel time between the two locations is approximately one minute.  Investigators believe that ACEVEDO did not make any stops between departing his residence and arriving at his business due to the short distance between the two.

41.     On January 31, 2023, another trash pull was conducted at TARGET PREMISES 1.

All trash was removed from garbage cans located at the curb awaiting pick up.  Recovered from the recycling bin was a U.S. Postal box with a UPS shipping label addressed to Miguel Acevedo at 15 Union Street, Meriden, CT from Healthy Herbs Store, 6555 Powerline Rd in Fort Lauderdale, FL.  In one of the garbage bags, investigators recovered a cut open heat-sealed clear plastic bag that had "2 lbs" written on the side in black ink.  The plastic bag appeared to have an unknown white colored powder residue and opaque substance on the inside.  This heat-sealed plastic bag, the substance inside, and the writing on it was similar to the heat-sealed plastic bag recovered on October 11, 2022, during the third trash pull.

42.     DEA Group Supervisor ("GS") Raymond McGrath, as witnessed by DEA TFO Matthew Lennon and DEA Special Agent ("SA") Matthew Brouillard, tested the edges of the plastic bag obtained from the trash pull. A positive indication was returned on a SIRCHIE NARK COCAINE ID SWIPE for a detectable amount of cocaine. Based on GS McGrath's training and experience, the plastic wrapping contains a jelly-like substance which is consistent with a masking agent used by narcotics traffickers to mask the odor of narcotics to avoid law enforcement K9 detection.

43.     Based on training and experience, investigators know that kilogram quantities of narcotics are commonly packaged utilizing substances, such as waxes, petroleum jelly, and greasing agents, on the outer layers to try and deter detection by law enforcement K9s.

**Acevedo Detailing and Car Sales LLC (TARGET PREMISES 2)**

44.     As mentioned previously, on June 25, 2021, Miguel ACEVEDO registered Acevedo Detailing with the State of Connecticut, Secretary of State, located at TARGET PREMISES 2.  ACEVEDO was listed as the Managing Member and sole principal of the business.

45.     According to State of Connecticut, Department of Labor records ("CT-DOL"), Acevedo Detailing was registered as a new employer on January 1, 2022. For Quarters 1 and 2 of 2022, Acevedo Detailing did not report any employees as having received wages. Based on the training and experience of IRS-CI SA Dustin Johnson, a TFO assigned to the DEA Task Force, the lack of employees being paid wages reportable on a Form W-2 indicates either no employees exist, employee wages are not being reported (i.e. they are paid off the books), or employees are being paid as independent contractors. The CS did not observe any employees in the business on the three interactions he/she had with ACEVEDO. Investigators have also not seen anyone that appear to be employees working at the business.

46.     The DEA CS who met with ACEVEDO went into TARGET PREMISES 2 on three occasions. Each time the CS went into the business, he/she noticed a wide variety of different cars parked inside. The last time the CS went into TARGET PREMISES 2, he/she noticed far fewer cars were parked inside than the previous two occasions, and ACEVEDO told him/her that he was trying to sell a car. Based on these observations, the CS said it appeared as though ACEVEDO was selling cars out of TARGET PREMISES 2.

47.     While ACEVEDO has previously purchased cars from auto auctions as a representative of at least four different other businesses licensed to purchase vehicles from an auto auction and would be familiar with the licensing requirement from those experiences, since establishing his own business, Acevedo Detailing, ACEVEDO has not obtained or held a valid license to purchase and sell used cars in accordance with State of Connecticut, Connecticut General Statute, Section 14-52(a).

48.     ACEVEDO also opened a Bank of America checking account in the name of

Acevedo Detailing on or about June 29, 2021, a few weeks after he was arrested by Meriden Police. The address listed on the bank statements for Acevedo Detailing is TARGET PREMISES 2. An analysis of those records through June 30, 2022, revealed 11 checks deposited into the account. One check was for $25,000 from the Mohegan Sun Casino. The other 10 checks were from a variety of businesses and individuals for a total of $27,565.14. Cash deposits into the account totaled $10,200 over three deposits. There were also what appeared to be merchant account deposits of $14,455 and deposits from Cash App for a total of $18,625.52. Based on the training and experience of SA Johnson, deposits into a business bank account are normally assumed to be proceeds from the business. However, it is unclear as to whether these are actually proceeds from the business since, among other things, ACEVEDO told the CS that he also sells cocaine and marijuana.

49.     An analysis of ACEVEDO's and A.R.'s personal bank accounts has revealed significant cash deposits from June of 2021 to July of 2022. For ACEVEDO's personal bank account at Bank of America, the primary funding source was cash deposits of approximately $85,215. CT-DOL records do not show ACEVEDO as having an employer over at least the last 12 quarters. Based on the training and experience of SA Johnson, the lack of an employer reported in CT-DOL records usually means an individual did not work or is self-employed. ACEVEDO's comment to the CS that he "works under the radar" leads investigators to believe that ACEVEDO is not keeping proper books and records at his business. Investigators also believe the cash being deposited into his personal bank account are proceeds from his narcotics trafficking as he told the CS that he sells cocaine and marijuana.

50.     Investigators also reviewed A.R.'s financial records for two reasons: (1) $281,537

in cash of suspected drug proceeds was found at TARGET PREMISES 1, in A.R. and ACEVEDO's bedroom, by Meriden Police in June of 2021; and (2) the Mohegan Sun Casino reported that A.R. cashed out a significant amount of casino chips in transactions over $10,000 on at least nine occasions from 2018 through 2021, with little or no associated gameplay at the casino. A review of A.R.'s personal bank account at Bank of America show it was opened on July 30, 2021, with an address of TARGET PREMISES 1. The primary funding source of A.R.'s checking account was cash deposits of approximately $68,110. Aside from A.R.'s employment income directly deposited in her bank account, neither she nor ACEVEDO are currently known to hold additional legitimate employment that would explain the cash deposits. The total amount of cash deposited into both bank accounts during the period of review totaled $153,325.

51.     Various Bank of America surveillance footage videos and photos dating back to January 1, 2022, appear to show A.R. depositing cash via ATM into ACEVEDO's personal bank account on many of the days she deposited cash into her own bank account at the ATM. Out of the 26 days that cash was deposited into A.R.'s bank account during the period of review, only five days with cash deposits did not coincide with a cash deposit into the personal bank account of ACEVEDO. Investigators suspect A.R. would deposit the cash into ACEVEDO's personal bank account either immediately before or immediately after depositing cash into her own bank account. In total, there were 21 simultaneous cash deposits into A.R.'s and ACEVEDO's personal bank accounts for a combined total of approximately $99,510.

52.     Based on the training and experience of SA Johnson, the high volume of cash deposits in both ACEVEDO's and A.R.'s personal bank accounts, appeared to be consistent with a common pattern of narcotics traffickers who typically only deposit enough cash on a monthly

basis that is needed to cover monthly expenses.  This is normally done by narcotic traffickers to prevent attention from being drawn to their deposit activity, and sources of income, by bank officials or law enforcement and prevent the triggering of automatic bank reporting requirements. This is again consistent with ACEVEDO's own claim to the CS that he  sells cocaine and recently got involved in selling marijuana and that he "works under the radar."

53.     ACEVEDO quickly moving to establish Acevedo Detailing only a few weeks after his arrest is also consistent with an attempt to relocate his narcotics trafficking from TARGET PREMISES 1, which had since been compromised by a criminal investigation.  When the DEA CS first met ACEVEDO at the business and inquired about the type of business that ACEVEDO did, ACEVEDO discussed his narcotics trafficking with the CS, including how he was an established cocaine dealer and just recently got involved in the distribution of marijuana. ACEVEDO then sold re-distribution level quantities of cocaine to the CS on two separate occasions, both occurring inside TARGET PREMISES 2.  For these reasons, as well as surveillance and post-controlled purchase debriefings of the CS, investigators believe that ACEVEDO utilizes this location to store illegal narcotics, as well as the tools needed to carry out the illicit activity such as digital scales, plastic baggies and cutting agents.

54.     For example, during controlled purchase #2, ACEVEDO was observed via pole camera at TARGET PREMISES 2 before the CS called to notify ACEVEDO that he/she wanted to meet.  At that point, ACEVEDO did not know that the CS was going to stop by TARGET PREMISES 2.  ACEVEDO also did not know that the CS wanted to conduct a controlled purchase nor did ACEVEDO know the quantity of cocaine the CS wanted to buy upon their meeting at TARGET PREMISES 2.  After the CS arrived and walked inside TARGET PREMISES 2, the CS

notified ACEVEDO that he/she was looking to purchase three ounces of cocaine.  As described above, ACEVEDO told the CS to come back in 20 minutes, because he was working on the sale of a vehicle.

55.     The CS departed TARGET PREMISES 2 at approximately 2:26 p.m. and returned to TARGET PREMISES 2 at approximately 2:59 p.m.  As discussed above, other than appearing to engage two individuals in the test drive of a black BMW at that location, at no time was ACEVEDO seen leaving TARGET PREMISES 2 during the time in between when the CS left and then returned to the business in order to obtain the narcotics ordered by the CS at that time.  For these reasons, investigators believe the narcotics sold to the CS on this date were being maintained inside TARGET PREMISES 2, even though ACEVEDO claimed that he had to go somewhere to pick them up.

56.     In addition, based on training and experience, investigators know that narcotics traffickers do not typically have three ounces of cocaine in pre-packaged amounts.  Instead, narcotics traffickers commonly package and sell cocaine in amounts that are requested by the user, which typically are 3.5 grams (referred to as an 8-ball), 100 grams, a quarter kilogram, half a kilogram, and a kilogram (or multiple kilograms).  As a result, investigators believe ACEVEDO had to re-package and weigh the multi-ounce cocaine quantity requested by the CS inside TARGET PREMISES 2.  Based on training and experience, investigators know that ACEVEDO would have needed at least a digital scale, a plastic baggy, and a larger supply of cocaine in order to re-package the three ounces of cocaine requested by the CS.  Based on the trash pull history from TARGET PREMISES 1, investigators know ACEVEDO has these items on hand and they are small enough to travel with him in a backpack, which he had been observed on pole camera

carrying between TARGET PREMISES 1 and TARGET PREMISES 2.

57.     The three ounces of cocaine within the plastic baggy that ACEVEDO provided to the CS was primarily in one large piece.  The piece of cocaine had distinct edge lines and corners. Based on training and experience, given the distinct edges and corners of the piece of cocaine provided to the CS, investigators believe ACEVEDO cut the three ounces of cocaine directly off of a kilogram quantity of cocaine.  As a result, I believe ACEVEDO is storing kilogram quantities of cocaine and paraphernalia utilized in the re-packaging and re-distribution of cocaine within TARGET PREMISES 2.

58.     Thereafter, on February 3, 2023, the CS placed a recorded call into ACEVEDO on his cellular phone.  During the call, the CS informed ACEVEDO that he/she will be up next week on Tuesday or Wednesday and should be good for five.  When the CS said he/she will be "up," he/she meant up to Meriden, CT and when he/she said "good for five," he/she was referring to five kilograms of cocaine.  ACEVEDO responded to the CS by saying "OK" and saying they can finish talking in person.  ACEVEDO then asked why the CS had not called him on FaceTime.

59.     Finally, on February 6, 2023, the CS placed a recorded FaceTime call into ACEVEDO on his cellular phone.  During the call, the CS asked ACEVEDO if he "would have them ready, the five of them."  ACEVEDO replied, "Yeah."  The CS was referring to five kilograms of cocaine when he/she said "the five of them."  The CS and ACEVEDO agreed to meet on Wednesday February 8, 2023 at TARGET PREMISES 2.  ACEVEDO told the CS to come "Anytime after nine."

60.     Based on this conversation, investigators believe ACEVEDO has at least five kilograms of cocaine on hand, otherwise, he would have told the CS he needed more time to

acquire the product.  Furthermore, investigators believe ACEVEDO will be storing at least five

kilograms of cocaine at TARGET PREMISES 2 leading up to the potential controlled purchase,

as ACEVEDO did not tell the CS to go anywhere else and previously told the CS to conduct a

future kilogram transaction the same way the CS had on the previous two controlled purchases—

by going to TARGET PREMISES 2.

## CONCLUSION

61.     As set forth above, there is probable cause to believe, and I do believe, that

ACEVEDO has committed the violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession

with Intent to Distribute Controlled Substances) set forth herein and therefore, respectfully request

the issuance of the specified arrest warrant by criminal complaint.

62.     As I have indicated in the section of this affidavit pertaining to my training and

experience, I know that narcotics traffickers, particularly those involved in distributing kilogram

quantities of cocaine, as ACEVEDO is believed to do with some regularity, often store drugs and

cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but

not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as

well as records regarding drug debts, within their residences and other properties, because they

can exercise complete dominion and control over their residences and can undertake to secure

these structures.

63.     I also know, based upon my training and experience, that drug proceeds and records

which have come in contact with controlled substances, including but not limited to cocaine, can

be detected by narcotics canines, even after the passage of time.

64.     I also know, based on my training and experience, as well as the training and

experience of SA Johnson, that small business owners commonly maintain journals, ledgers, and other records showing the disposition of funds in the normal course of business.  I know that the funds going into and out of a company can be tracked by tracing the paper trail that is created by entries into the business records and bank accounts and by the documents received or prepared in connection with each transaction.  I also know that legitimate small business owners typically work more hours than an average worker and commonly bring business records home with them.

65.    There is probable cause to believe, and I do believe, that the items listed on Attachment B-1 for TARGET PREMISES 1 and Attachment B-2 for TARGET PREMISES 2, including controlled substances, drug paraphernalia, drug packaging, controlled substances residue, bank and financial records, business records, drug proceeds, and drug records, all of which are evidence of violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute Controlled Substances) and 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), are located within TARGET PREMISES 1 and TARGET PREMISES 2.

**REQUEST TO SEAL**

66.     I request that the search warrant application and this affidavit be sealed.  The investigation of the criminal activities of the ACEVEDO and is ongoing.  Premature disclosure of the contents of this affidavit would frustrate this investigation by alerting the targets of the investigation to the nature of the probe, the techniques employed, and the evidence developed to date, and by limiting the use of the grand jury to develop further admissible evidence.  Therefore, I respectfully request that this Court seal until further order of the Court this affidavit, the application, and accompanying search warrant, except that copies of the search warrant be provided to ACEVEDO, and/or left at the premises to be searched as provided by the Criminal Rules of Criminal Procedure.

Respectfully submitted,

Maria A Case
Digitally signed by Maria A Case
Date: 2023.02.07 11:56:40 -05'00'

Maria Case
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to by telephone on  2/7/2023  in New Haven, Connecticut.

Maria E. Garcia
Digitally signed by Maria E. Garcia
Date: 2023.02.07 16:42:45 -05'00'

HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

## DESCRIPTION OF PREMISES TO BE SEARCHED

The property to be searched is 54 SOUTH AVE, MERIDEN, CONNECTICUT, 06451 ("**TARGT PREMISES 1**") (depicted in the photograph below), including the surrounding grounds, any garages, sheds, storage rooms, storage lockers, trash containers, and any out-buildings located thereon. The building is a two-story residential, single-family residence with the number "54" posted on both sides of the stairs that lead to the front door.  The residence has gray/light blue colored siding at the top and dark colored brick at the bottom.  The door to the residence is red, with a white storm door, and the mailbox is posted on the residence to the right of the door.  There appears to be a surveillance camera mounted to the left side of the residence with a cable dish above it on the roof.  The main entrance is located on South Ave.



## ATTACHMENT B-1

## ITEMS TO BE SEIZED FROM TARGET PREMISES 1

1.        All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(C) (Possession with Intent to Distribute Controlled Substances) and 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), regarding the narcotics trafficking and financial activities of MIGUEL ACEVEDO ("ACEVEDO"), and the operation of ACEVEDO DETAILING AND CAR SALES LLC ("ACEVEDO DETAILING") by ACEVEDO or any entities to which he has a financial, fiduciary, or ownership interest, including:

a.   Controlled substances, including but not limited to heroin, cocaine, cocaine base, and residue of heroin, cocaine, and cocaine base;

b.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol mannite, vitamin B-12, inositol, etc;

c.   Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e.   Items of personal property that pertain to the identity of the person(s) within the premises and occupancy, control, or ownership of the premises, including but not limited to

cancelled mail, deeds. leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

f.   Documents indicating interstate travel, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel and car rental statements, correspondence with travel agencies and other travel-related businesses, airline, rental car, and hotel receipts, frequent flyer or user cards and statements, telephone bills, photographs/video tapes, and other papers relating to domestic and international travel, including computerized records;

g.   Cellular/digital wireless telephones, and "smart" cellular telephones, electronic paging devices, speed dial telephones, electronic speed dialing devices, electronic personal organizers, caller identification memory devices as well as the telephone numbers stored within, telephone answering machines, and telephone answering machine tapes;

h.   Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

i.   Firearms and ammunition;

j.   Records of banking, financial, and investment accounts for ACEVEDO and ACEVEDO DETAILING, including statements, checks, check stubs or registers, deposit slips and deposit items, withdrawal slips, cancelled checks, cashier's checks, money orders, wire transfer documents, loan records, mortgage records, financial statements, credit card statements, safe deposit box rental and payment documents, and safe deposit box keys;

k.   Any and all business records, including general ledgers and subsidiary ledgers, cash receipts journals, cash disbursement journals, petty cash journals, appointment books, calendars, passbooks, invoices, written estimates, receipts, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts receivable ledgers, correspondence, point-of-sale (POS) system hardware and records, computerized bookkeeping software and files;

l.   Any and all copies of and/or original federal and state income tax, payroll tax, sales tax, and informational returns, including amended federal and state income tax, payroll tax, and sales tax returns, as well as any and all records used in, or resulting from, the preparation and filing of federal and state income tax, payroll tax, and sales tax returns, consisting of but not limited to work-papers, notes, papers, memoranda and correspondence;

m.  Any and all records of income and expenses, such as profit and loss statements, financial statements, balance sheets and income and expense journals, and documents pertaining to cash expenditures;

n.   Records relating to the scheduling and booking of clients, as well as the purchase and sale of any vehicles, including event calendars, all forms of correspondence with customers, contracts, purchase and sale agreements, non-disclosure agreements, emails, notebooks, and memoranda;

o.   Loan records, including applications, financial statements, loan collateral, credit and background investigations, loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record

disclosing the total amount of discount or interest paid annually, records of any liens, loan correspondence files, and internal bank memoranda;

p.   Records related to the potential or actual purchase and/or sale of businesses, including estimates of revenue and income, contracts, purchase and sale agreements, appraisals, inventories, representation agreements, non-disclosure agreements, correspondence, emails and memoranda;

q.   Credit card records, including application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and methods (cash or check) of repayment, checks used to make repayments (front and back);

r.   Records of purchases of bank checks, cashier, teller, travelers check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders;

s.   Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through a bank, savings bond transactions and investment accounts. Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions; and

t.   Records and tangible items related to the source, collection, use and/or secretion of assets or cash, including cash and United States Currency in excess of $2,000.

## ATTACHMENT A-2

### DESCRIPTION OF PREMISES TO BE SEARCHED

The property to be searched is 231 WEST MAIN STREET, MERIDEN, CONNECTICUT 06451 ("**TARGET PREMISES 2**") (depicted in the photograph below), including the surrounding grounds, any garages, sheds, storage rooms, storage lockers, trash containers, and any out-buildings located thereon. The business is a single-story commercial building with one long driveway that is fenced on the right side and leads to a garage bay. There is an entryway door built into the garage door. There is a sign above the garage bay door that has a photo of a vehicle and states, "ACEVEDO DETAILING AND CAR SALES LLC" at the top and the phone number "203-886-9372" at the bottom. Beneath the sign and above the garage bay there appears to be several lights and a surveillance camera posted. The main entrance is located on West Main Street.



**ATTACHMENT B-2**

**ITEMS TO BE SEIZED FROM TARGET PREMISES 2**

1.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(C) (Possession with Intent to Distribute Controlled Substances) and 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), regarding the narcotics trafficking and financial activities of MIGUEL ACEVEDO ("ACEVEDO") and the operation of ACEVEDO DETAILING AND CAR SALES LLC ("ACEVEDO DETAILING") by ACEVEDO or any entities to which he has a financial, fiduciary, or ownership interest, including:

u.   Controlled substances, including but not limited to heroin, cocaine, cocaine base, and residue of heroin, cocaine, and cocaine base;

v.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol mannite, vitamin B-12, inositol, etc;

w.   Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

x.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

y.   Items of personal property that pertain to the identity of the person(s) within the premises and occupancy, control, or ownership of the premises, including but not limited to cancelled mail, deeds. leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

z.   Documents indicating interstate travel, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel and car rental statements, correspondence with travel agencies and other travel-related businesses, airline, rental car, and hotel receipts, frequent flyer or user cards and statements, telephone bills, photographs/video tapes, and other papers relating to domestic and international travel, including computerized records;

aa. Cellular/digital wireless telephones, and "smart" cellular telephones, electronic paging devices, speed dial telephones, electronic speed dialing devices, electronic personal organizers, caller identification memory devices as well as the telephone numbers stored within, telephone answering machines, and telephone answering machine tapes;

bb. Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

cc.  Firearms and ammunition;

dd. Records of banking, financial, and investment accounts for ACEVEDO and ACEVEDO DETAILING, including statements, checks, check stubs or registers, deposit slips and deposit items, withdrawal slips, cancelled checks, cashier's checks, money orders, wire transfer documents, loan records, mortgage records, financial statements, credit card statements, safe deposit box rental and payment documents, and safe deposit box keys;

ee.  Any and all business records, including general ledgers and subsidiary ledgers, cash receipts journals, cash disbursement journals, petty cash journals, appointment books, calendars, passbooks, invoices, written estimates, receipts, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts

receivable ledgers, correspondence, point-of-sale (POS) system hardware and records, computerized bookkeeping software and files;

ff.   Any and all copies of and/or original federal and state income tax, payroll tax, sales tax, and informational returns, including amended federal and state income tax, payroll tax, and sales tax returns, as well as any and all records used in, or resulting from, the preparation and filing of federal and state income tax, payroll tax, and sales tax returns, consisting of but not limited to work-papers, notes, papers, memoranda and correspondence;

gg. Any and all records of income and expenses, such as profit and loss statements, financial statements, balance sheets and income and expense journals, and documents pertaining to cash expenditures;

hh. Records relating to the scheduling and booking of clients, as well as the purchase and sale of any vehicles, including event calendars, all forms of correspondence with customers, contracts, purchase and sale agreements, non-disclosure agreements, emails, notebooks, and memoranda;

ii.   Loan records, including applications, financial statements, loan collateral, credit and background investigations, loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loan correspondence files, and internal bank memoranda;

jj.   Records related to the potential or actual purchase and/or sale of businesses, including estimates of revenue and income, contracts, purchase and sale agreements,

appraisals, inventories, representation agreements, non-disclosure agreements, correspondence, emails and memoranda;

kk. Credit card records, including application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and methods (cash or check) of repayment, checks used to make repayments (front and back);

ll.  Records of purchases of bank checks, cashier, teller, travelers check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders;

mm.      Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through a bank, savings bond transactions and investment accounts. Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions; and

nn. Records and tangible items related to the source, collection, use and/or secretion of assets or cash, including cash and United States Currency in excess of $2,000.

oo. Any vehicles within the building of the premises, including any trunks and compartments, including secret compartments, often referred to as "traps."